# In the United States Court of Federal Claims

Bid Protest
No. 16-109C
(Filed Under Seal: March 29, 2016 | Reissued: April 6, 2016)[*]

| | |
|---|---|
| PRESCIENT, INC., | ) Keywords: Post-Award Bid Protest; |
| | ) Motion for Judgment on the |
| | ) Administrative Record; Standing; |
| Plaintiff, | ) Disparate Treatment; Material |
| | ) Deficiencies. |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| MATT MARTIN REAL ESTATE | ) |
| MANAGEMENT, LLC, | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

*Janine S. Benton*, Benton, Potter and Murdock, P.C., Falls Church, VA, for Plaintiff, with whom were *Sharon A. Roach*, Of Counsel, *Kathy C. Potter*, Of Counsel, *John M. Murdock*, Of Counsel, and *Rosanne E. Stafiej*, Of Counsel.

*Eric P. Bruskin*, Trial Attorney, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant. *Julie K. Cannatti*, Of Counsel, and *Blythe I. Rodgers*, Of Counsel, U.S. Department of Housing and Urban Development, Washington, DC.

*Keir X. Bancroft*, Venable LLP, Washington, DC, for Defendant-Intervenor, with whom were *Nathaniel S. Canfield*, *Collier L. Johnson II*, Venable LLP, Washington, DC, and *J. Scott Hommer III*, Venable LLP, Tysons Corner, VA.

---

[*] This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. Neither party requested redactions, and the opinion is now being reissued in full.

## OPINION AND ORDER

**KAPLAN, Judge.**

The plaintiff in this case is Prescient, Inc. (Prescient), an unsuccessful offeror in a procurement for asset management services. Prescient filed this post-award bid protest to challenge a decision of the Department of Housing and Urban Development (HUD) finding its proposal technically unacceptable under the terms of the solicitation and excluding it from further consideration for an award.

Currently before the Court are the parties' cross-motions for judgment on the administrative record. For the reasons set forth below, Prescient's motion is **DENIED** and the government's cross-motion is **GRANTED**.

## BACKGROUND

I.   **HUD's Asset Management Solicitation**

   A.   Overview

The Department of Housing and Urban Development, through the Federal Housing Administration (FHA), administers a single-family home mortgage insurance program in which the FHA insures approved lenders against the risk of financial loss. AR Tab 2H at 492. In the event of a default on an FHA-insured home mortgage, HUD may take possession of the property. Id. As a result of its acquisition of these properties, HUD manages and sells a large inventory of single-family homes, endeavoring to do so "in a manner that promotes home ownership, preserves communities, and maximizes return to the FHA insurance funds." Id.

HUD contracts with real estate management and marketing companies across the country to service HUD's Real-Estate Owned (REO) portfolio. To that end, on August 25, 2014, HUD initiated the procurement that is the subject of this action when it issued Solicitation No. DU204SA-13-R-0005. See AR Tab 2. The solicitation involved twelve geographic areas. These included, as is relevant to this case, area 2D, which covered HUD properties in Kansas, Oklahoma, Arkansas, Louisiana, Missouri, and Southern Texas. AR Tab 2H at 640–41. The contract to be awarded was a hybrid indefinite-quality/indefinite-quantity/indefinite-delivery contract with both fixed-price/fixed-unit-rate and cost-reimbursable contract line items. Id. at 638.

As the solicitation described, the "purpose of this performance based contract [was] to obtain marketing and sales services for HUD's REO properties." Id. at 494. The Performance Work Statement (PWS) identified five objectives for Asset Managers (AM):

1.   Properties are accurately and competitively valued.
2.   Sales achieve the highest net return.
3.   Holding time is minimized.
4.   Sales create owner-occupant opportunities.
5.   Closing proceeds are properly accounted for and delivered to HUD in a timely manner.

Id. at 494–95.

According to the solicitation, and consistent with Federal Acquisition Regulation (FAR) 15.306(a), HUD intended to award the contract without conducting discussions with the offerors. Id. at 637; see also FAR 15.306(a)(1) ("Award may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions."). As a result, the solicitation prompted offerors to provide their "best terms from a cost or price and technical standpoint." Moreover, the solicitation noted that the Contracting Officer (CO) may "limit the number of proposals in the competitive range to the greatest number that will permit an efficient competition among the most highly rated proposals." Id.

The solicitation provided that awards would be made to offerors whose proposals represented the best value to the agency based on a performance/price trade-off methodology. Under that process, technical approach would be evaluated on a pass-fail basis, and a trade-off would be conducted between past/present performance and price, with the former "approximately equal" in weight to the latter. Id. at 654.

**B.  Technical Evaluation**

Offerors were instructed to divide their proposals into four volumes: Volume I: RFP Documents; Volume II: Technical Proposal; Volume III: Past/Present Performance Proposal; and Volume IV: Business Proposal. Id. at 644–53. Volume II, the technical proposal, was to include three sub-factors: a Work Flow Chart; an Organizational Chart; and a Condensed Marketing Plan. Id. at 645–48. The solicitation contained discrete requirements to be addressed for each sub-factor. Id. Volume II was also to include a "Technical Proposal narrative" that "include[d] all the information required [in Volume II] in detailed content." Id. at 646.

This bid protest concerns only Prescient's compliance with the first sub-factor, which required that offerors submit a Work Flow Chart that 1) "include[d] the specific process steps, timing and decision points that reflect[ed] how the Offeror [would] manage a typical property consistent with HUD's process under the requirements of the PWS;" and 2) discussed each of the five objectives for asset managers set forth above. Id. at 646. The solicitation stated that offerors were required to include in their proposals a narrative "that adds detail to the Offeror's workflow chart." Id. at 646–47.

The solicitation specifically informed offerors that the agency would evaluate the technical proposals "on the information presented therein." Id. It stated that offerors "shall provide [a] convincing rationale to address how the Offeror intends to meet the [government's] requirements." Id. Moreover, the solicitation stated that "[a]ny information not in its appropriate Section and not cross-referenced to a specific location will be assumed to have been omitted." Id.

HUD stated that it would begin its evaluation by reviewing an offeror's Technical Proposal to "determine if the Offeror provides a sound, compliant approach that meets the requirements of [the solicitation] and demonstrates a thorough knowledge and understanding of those requirements and associated risks." Id. at 655. The agency stated that it would independently evaluate each of the sub-factors listed above on a "pass/fail" basis. Id.

The solicitation set forth specific criteria by which the agency would evaluate the offeror's Work Flow Chart. It stated that the Offeror's work flow processes would be evaluated to determine if they provided "a sound, acceptable design that demonstrates the Offeror's approach, methods and procedures and are in compliance with the [PWS]." Id. at 655. In addition, offerors would be evaluated "on their demonstrated understanding of the mission objective and its ability to manage the minimum five [PWS objectives for asset managers (set forth above)]." Id.

Under the solicitation's criteria, an acceptable technical rating would be assigned where the proposal "clearly meets the requirements of the solicitation" so that "[t]he risk of unsuccessful contract performance is low." Id. An unacceptable rating would be given to a proposal that "contains deficiencies and does not clearly meet the requirements of the solicitation," signifying that "[t]he risk of unsuccessful contract performance is high." Id. The solicitation defined a "deficiency" as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." Id. at 656.

Finally, the solicitation noted that "[t]he government has no intention of evaluating technically unacceptable proposals on Price and Past/Present Performance." Id. at 654. As a result, if an offeror's proposal failed in any one of the technical sub-factors, the government would not evaluate that proposal further. Id.

## II.    Prescient's Offer and HUD's Determination that Prescient's Technical Approach was Unacceptable

Prescient submitted its proposal for area 2D to HUD on September 23, 2014. AR Tab 6C. The proposal was divided into four volumes, as required by the solicitation. Id. Volume II of Prescient's offer included an "Executive Summary of the Technical Proposal," a Work Flow Chart, an Organizational Chart, and a "Draft Marketing Plan." Id. at 3081–3105.

HUD convened a Technical Evaluation Panel (TEP) to review the twenty-four proposals submitted for area 2D. See AR Tab 9A. According to the Source Selection Plan, TEP members were to independently evaluate the offers, "discuss their individual evaluations to the extent necessary to reach a consensus opinion," and then "rate and determine the technical acceptability of each proposal." AR Tab 1A at 9. The TEP was also directed to develop a TEP Report that "state[d] the conclusion and then provide[d] specifics on any deficiencies of the Technical Proposal that support the conclusions and identify citations within the proposal to support the rating." Id. at 9–10.

The TEP rated Prescient's proposal "Technically Unacceptable." AR Tab 9A at 4407–08. The TEP report concluded that Prescient "provided a not sound and not compliant technical approach which did not meet the requirements of the PWS and did not demonstrate a thorough knowledge and understanding of those requirements and their associated risks." Id. at 4407. Specifically, according to the TEP, Prescient's proposal "had several contradictions with the PWS requirements which is a strong indication that [Prescient] does not understand the requirements and tasks of this solicitation." Id.

First, the report noted that Prescient's Work Flow Chart called for new appraisals "for transition properties and properties where contracts fell through and the appraisal is over 6 months" old. AR Tab 6C at 3087. Section 5.2.1.2.3 of the solicitation, however, specifies that "[n]ew appraisals other than the appraisal that is used as one or more multiple valuation tools to help establish list price, if applicable, can only be ordered with GTR approval."

[1] AR Tab 2H at 522. The TEP determined that Prescient's proposal conflicted with section 5.2.1.2.3 because Prescient's Work Flow Chart did not state that it would seek GTR approval before ordering a new appraisal. AR Tab 9A at 4407.

Second, as described in the solicitation, HUD "offers properties for sale through direct and competitive sales methods." AR Tab 2H at 527. Direct sales are implemented through, among other things, a tenant's exercise of his right of first refusal and a lottery process. Id. at 528–31. If direct sales methods are unsuccessful, then the properties are to be sold on a competitive basis. Id. at 533. That competitive sales process begins with a relatively short "exclusive listing period" during which only certain individuals, organizations and government entities may bid on properties, and then proceeds to an "extended listing period" where properties are listed for sale to all bidders. Id. at 533–35.

The TEP found that the duration periods for the lottery and exclusive listing processes that were set forth in Prescient's Work Flow Chart were inconsistent with those set forth in the PWS. AR Tab 9A at 4407. In particular, section 5.2.2.2.3 of the solicitation states that certain single-unit properties and uninsurable properties "shall be listed for sale on the HUD Bid Site for a period of seven (7) calendar days (the Lottery Period)." AR Tab 2H at 531. The TEP found that Prescient's proposal did not meet this requirement because its Work Flow Chart proposed a five day listing period for those properties. AR Tab 9A at 4407.

Additionally, section 5.2.2.3.1 of the solicitation called for a fifteen-day exclusive listing period for insured and insured with escrow properties. AR Tab 2H at 533. Prescient's Work Flow Chart, however, proposed a ten-day listing period for insured with escrow properties. AR Tab 6C at 3089. The TEP explained that because "[t]he offeror may not reduce the Exclusive period from 15 days to 10 days for [insured with escrow] properties," Prescient's proposal was deficient in this respect as well. AR Tab 9A at 4407.

Finally, the TEP concluded that Prescient's Work Flow Chart did not adequately address the first of the five objectives for asset managers listed in the PWS, requiring that properties be "accurately and competitively valued." Id. The TEP found that Prescient's proposal was deficient in this regard because it did not specify that Prescient would use a combination of valuation tools to develop the list price, as the TEP concluded was required by section 5.2.1.7 of the solicitation. Instead, Prescient's proposal stated that it would use an appraisal to determine a property's list price, resorting to other valuation tools only if its review of the appraisal revealed weaknesses.

---

[1] "GTR" refers to a Government Technical Representative, an agency representative who "is responsible for giving Contractors technical advice and guidance related to the work required by the contract." AR Tab 2H at 499.

AR Tab 6C at 3087. As a result, the TEP concluded that the Work Flow Chart did not "satisfactorily address properties being accurately and competitively valued." Id. at 4407.

The TEP rated Prescient's technical proposal acceptable as to the other two sub-factors (Organizational Chart and Condensed Marketing Plan). Id. at 4408. However, because the TEP found Prescient's Work Flow Chart unacceptable, and because the sub-factors were evaluated independently on a pass/fail basis, Prescient's overall Technical Approach did not receive a passing rating. Id. at 4407; AR Tab 2H at 654–55.

**III.    Notification of Unacceptable Rating and HUD's Contract Award to Matt Martin Real Estate Management**

As noted, HUD received twenty-four offers for area 2D. AR Tab 8 at 4345–46. Of those offers, thirteen (including Prescient's) were found technically unacceptable.

On August 25, 2015, HUD notified Prescient that its offer was technically unacceptable and that, "[i]n accordance with Section M.2 titled 'Evaluation Approach', paragraph 2, of the solicitation, 'the government has no intention of evaluating technically unacceptable proposals on Price and Past/Present Performance,' therefore; your proposal will not receive any further consideration under this solicitation." AR Tab 10A at 4924. Further, Prescient was advised that "[t]he Contracting Officer has made the decision to enter into discussions with those Offerors who are determined technically acceptable with reasonable and balanced pricing prior to award, pursuant to FAR 15.306(c), and has established a competitive range for purposes of efficiency." Id. However, the contracting officer advised Prescient, "[b]ecause your proposal was rated technically unacceptable, your proposal will be excluded from the competitive range, and you will not have an opportunity to revise your initial proposal."[2] Id.

As permitted by FAR 15.505, Prescient requested a pre-award debriefing. Pursuant to FAR 15.505(b), HUD elected to perform a post-award written debriefing instead. AR Tab 12I at 5482.

On September 25, 2015, HUD awarded the contract for area 2D to defendant-intervenor Matt Martin Real Estate Management LLC (MMREM). AR Tab 12M at 5497. Thereafter, on October 9, 2015, HUD sent Prescient a post-award debriefing letter. AR Tab 11C at 4945–48. The letter included a review of the findings of the TEP and notified Prescient that its Technical

---

[2] While the final TEP Report is dated August 24, 2015, the CO's competitive range determination memorandum is dated July 17, 2015. See AR Tab 9A, AR Tab 8. According to the CO's declaration, she prepared the competitive range memorandum on the basis of a draft of the TEP Report that was available to her on July 17, 2015. She states that before she sent the August 25, 2015 notification letters to Prescient and other excluded offerors, she ensured that all of the information in the competitive range memorandum accurately reflected the final TEP report. She did not, however, update the date on her competitive range determination. Barbee Decl. ¶ 3, Def.'s Cross-Mot. for J. on the Admin. R. Ex. 1, ECF No. 34.

Rating was "Unacceptable" because its Work Flow Chart was deemed "Unacceptable." Id. at 4946. It also informed Prescient that HUD had awarded MMREM the contract. Id. at 4497.

Thereafter, Prescient sent the CO a letter "disagree[ing] with the finding of the government's Technical Evaluation Panel" and asking several questions related to the TEP's finding that the proposal was technically unacceptable. AR Tab 13G at 5525–26. HUD responded on October 14, 2015. In this response letter, the CO wrote that "Prescient submitted an unacceptable Workflow Chart that ignored mandatory time requirements, and would potentially cost the Government additional monies associated with unnecessary appraisals." AR Tab 13H at 5528–29.

## IV.    GAO Protest

Prescient filed a protest of the contract award with the Government Accountability Office (GAO) on October 19, 2015. AR Tab 12P. GAO responded to Prescient's complaint on November 18, 2015. AR Tab 12N. Meanwhile, after multiple protests were filed for area 2D, HUD informed MMREM that it was staying performance of the contract. AR Tab 12K at 5487.

On December 29, 2015, Precision Asset Management Corporation, another disappointed offeror, filed a complaint in this Court challenging HUD's evaluation of its proposal. See Precision Asset Mgmt. Corp. v. United States, No. 15-cv-1495, 2016 WL 900097 (Fed. Cl. Feb. 26, 2016). GAO then dismissed Prescient's complaint, citing 4 C.F.R. § 21.11(b), which directs the GAO to dismiss complaints where the matter involved is the subject of litigation before a court of competent jurisdiction. AR Tab 12O at 5513.

## V.    This Action

On January 21, 2016, Prescient filed the present complaint in this Court. Compl., ECF No. 1. It filed an amended complaint on January 27, 2016. Am. Compl., ECF No. 6. After the case was filed, the government agreed to delay its implementation of the contract award to MMREM until April 1, 2016.

In its complaint, Prescient alleges that HUD committed a variety of errors in its evaluation of Prescient's technical proposal, and that HUD unreasonably rated the proposal technically unacceptable. Am. Compl. at 7–15. It seeks a declaratory judgment that HUD's evaluation of its proposal was arbitrary, capricious, and contrary to law and an order requiring HUD to terminate its contract with MMREM and re-compete the contract. Id. at 4.

On January 27, 2016, the Court granted MMREM's motion to intervene as a defendant-intervenor. ECF No. 5, 6. The government filed the administrative record on February 5, 2016. ECF No. 23. Prescient then filed a motion to supplement the administrative record, which the Court denied by Order of February 12, 2016. See Order, ECF No. 24.

Prescient's motion for judgment on the administrative record was filed on February 17, 2016. ECF No. 32. The government filed its cross-motion and response on March 1, 2016, ECF No. 35, as did MMREM, ECF No. 36. Oral argument on the cross-motions was held on March 17, 2016.

**DISCUSSION**

## I.   Jurisdiction

### A.   The Court of Federal Claims' Bid Protest Jurisdiction

In accordance with 28 U.S.C. § 1491(b)(1), the Court of Federal Claims has jurisdiction to "render judgment on an action by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." In order to invoke the Court's bid protest jurisdiction a plaintiff must be an "interested party." CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015); Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002). As the Federal Circuit has explained, an "interested party" is "an actual or prospective bidder . . . whose direct economic interest would be affected by the award of the contract." CGI Fed., 779 F.3d at 1348 (quoting Am. Fed'n of Gov't Emp., AFL-CIO v. United States, 258 F.3d 1294, 1299 (Fed. Cir. 2001); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

In a post-award bid protest, the protestor has suffered prejudice if it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Info. Tech., 316 F.3d at 1319 (citing Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech., 316 F.3d at 1319. Put differently, the protester must have been "prejudiced" by the alleged error. Tinton Falls Lodging Realty, LLC v. DMC Management Servs., LLC, 800 F.3d 1353, 1358 (Fed. Cir. 2015).

Prescient is an interested party with standing to invoke this Court's jurisdiction. First, it was an actual offeror because it submitted a proposal in response to the solicitation. Second, but for what Prescient alleges was an arbitrary and capricious finding by the TEP that its proposal was technically unacceptable, Prescient would have had a substantial chance of winning the award. Thus, had the TEP found Prescient's technical proposal acceptable, Prescient would have been included in the competitive range. Prescient, therefore, has established that there was a substantial chance that it would have received the award because, absent the alleged errors, its proposal would have been "within the zone of active consideration." C.A.C.I., Inc.-Fed. v. United States, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983) (quoting Morgan Business Associates v. United States, 619 F.2d 892, 896 (Ct. Cl. 1980)). As a result, Prescient has standing to bring this complaint and the Court has jurisdiction to reach the merits of its complaint.

## II.   Legal Standards

### A.   Standard for Granting Motions for Judgment on the Administrative Record

Pursuant to RCFC 52.1, the court reviews an agency's procurement decision based on the administrative record. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379 (Fed. Cir. 2009). Thus, to resolve a motion for judgment on the administrative record, the court conducts an

expedited trial on the paper record, making factual findings where necessary. Bannum, Inc. v. United States, 404 F.3d 1346, 1354 (Fed. Cir. 2005). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, 404 F.3d at 1356). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, 404 F.3d at 1356.

### B. Standard of Review in Bid Protest Cases

The standard of review used to evaluate agency decisions in bid protest cases is the same as the standard used to evaluate agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 706 (2012). See 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Under that standard, to successfully challenge an agency's procurement decision, a plaintiff must show that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Bannum, 404 F.3d at 1351. "The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

In a bid protest, the disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001). Indeed, such a challenge can succeed only where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., Inc.–Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (alteration in original) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Further, to survive review, "[t]he agency need only articulate 'a rational connection between the facts found and the choice made." Sci. and Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 63 (2014) (quoting State Farm, 463 U.S. at 43).

### III. Merits of Prescient's Bid Protest

### A. GTR Approval of Second Appraisal (section 5.2.1.2.3)

### 1. TEP Finding of Deficiency

As noted, the solicitation required that a HUD property be appraised in preparation for its listing for sale. AR Tab 2H at 522. Specifically, section 5.2.1.2 states that after a property is inspected, "the Contractor shall obtain an AS IS appraisal performed by an FHA roster appraiser" in order to develop the property's list price. Id. The solicitation further states at section 5.2.1.2.3 that "[n]ew appraisals other than the appraisal that is used as one or more

multiple valuation tools to help establish list price, if applicable, can only be ordered with GTR approval." Id.

The TEP found that Prescient's proposal conflicted with section 5.2.1.2.3 because Prescient's Work Flow Chart did not provide for GTR approval in circumstances where a new appraisal was to be ordered. AR Tab 9A at 4407. Instead, it included the unqualified statement that, "[f]or transition properties and properties where contracts fell through and the appraisal is over 6 months, a new appraisal will be ordered." AR Tab 6C at 3087 (emphasis supplied).

Prescient contends that the TEP's conclusion that its proposal conflicted with section 5.2.1.2.3 was arbitrary and capricious. In particular, it focuses on HUD's debriefing letter, which included an observation that Prescient's proposal could "potentially cost the Government additional monies associated with unnecessary appraisals." AR Tab 13H at 5528–29. Prescient contends that this statement was erroneous because the solicitation made clear that only "appraisals used to establish list price would be compensated as pass through expenses." Pl.'s Mem. in Supp. of Pl.'s Mot. for J. on the Admin. R. (Pl.'s Mem.) at 7, ECF No. 33 (citing the solicitation at AR Tab 2H at 484–85). In fact, Prescient observes, it expressly acknowledged in its draft marketing plan that "only the first appraisal is reimbursable by HUD." AR Tab 6C at 3100.

The Court agrees with Prescient that the debriefing letter's observation that Prescient's proposal could potentially require the government to pay for additional appraisals appears to be an error because the solicitation specifies that the cost of additional appraisals will be borne by the contractor, not the government. Nonetheless, the solicitation did not condition the requirement of GTR approval on whether or not HUD would be required to pay separately for any additional appraisals; as noted, under the solicitation HUD would not be liable for such additional expenses. Therefore, Prescient's acknowledgement of its own liability to bear the costs of any additional appraisals did not bring its proposal into compliance with section 5.2.1.2.3. HUD's conclusion that Prescient's proposal conflicted with the solicitation's requirement that contractors receive GTR approval before ordering a second appraisal was neither arbitrary, capricious, nor contrary to law.[3]

---

[3] There is no merit to Prescient's contention that its "failure to add express language regarding GTR approval of a second appraisal does not show that it took exception to this requirement or that it would bypass GTR approval, findings that are required to support a determination that it did not conform its proposal to the Solicitation." Pl.'s Mem. at 33 (citing IBM Corp. v. United States, 119 Fed. Cl. 145, 156 (2014)). In IBM, this Court declined to find arbitrary and capricious a contracting officer's conclusion that certain reservation-of-right language in the successful offeror's proposal was not inconsistent with the terms of the solicitation. 119 Fed. Cl. at 156. To be sure, the Court observed that the offeror's failure to take exception to the relevant provisions of the solicitation was one factor that supported the contracting officer's determination that the successful offeror's proposal conformed to the solicitation. Id. But there were also numerous other indicia of the proposal's conformity to the solicitation that the Court found sufficient to support the agency's decision in that case, particularly given the highly deferential standard of review that is applicable to such agency judgment calls. See id. (discussing other indicia and concluding that "reading the proposal as a whole, and given the

**2.   Allegations of Disparate Treatment**

Prescient alleges that the TEP subjected it to disparate treatment when it determined that Prescient's offer did not conform to section 5.2.1.2.3. It claims that two other offerors whose proposals were found technically acceptable, Offerors 27 and 40, also proposed that they would conduct additional appraisals without stating that they would first seek GTR approval.

Prescient's allegation is incorrect as to Offeror 27. It is true that Offeror 27's Work Flow Chart states: "Request an As Is appraisal or another eval method. Ensure appraiser is in FHA roster / Repeat every 6 months if appraisal expires." AR Tab 5E at 1844. But Offeror 27's "Work Flow Narrative" clarifies that, "[w]ith GTR approval, new appraisals will be ordered every six (6) months until the property is sold." Id. at 1847.

Prescient is correct, however, as to Offeror 40. Its "Work Flow Narrative" states, without qualification, that "[a] new appraisal will be ordered for aged inventory six months since the last appraisal." AR Tab 5H at 2274. As Prescient notes, the TEP nonetheless found Offeror 40's Work Flow Chart technically acceptable. AR Tab 9A at 4668.

While Prescient has identified a discrepancy in the TEP's treatment of Offeror 40's Work Flow Chart, the Court does not believe that this single discrepant result provides a sufficient basis for concluding that the TEP's evaluation of Prescient's proposal was arbitrary and capricious. Instead, it shows (at most) that the TEP committed an error when it failed to rate Offeror 40's proposal technically unacceptable. But "[t]o prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process." Alfa Laval Separation, 175 F.3d at 1367; see also Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1380 (Fed. Cir. 2009) (observing that "[t]o establish prejudice a protestor must show that there was a substantial chance it would have received the contract but for the government's error in the bid process").

In this case, even if the agency had properly found Offeror 40's proposal technically unacceptable, that would not have resulted in Prescient's inclusion in the competitive range. It would have resulted only in Offeror 40's exclusion. Accordingly, the Court concludes that the TEP did not commit any error, prejudicial or otherwise, when it found that Prescient's technical proposal did not conform to section 5.2.1.2.3.

---

other indications of [the successful offeror's] willingness to conform itself to the PWS contained in its proposal, it was reasonable for the Army to read the language" as conforming). In this case, of course, other than the fact that Prescient did not take exception to the GTR approval requirement, there are no indicia of an intent to seek such approval. Further, the applicable principles of deference cut against Prescient in this case, as the Court is here reviewing an agency determination of non-conformity, whereas in IBM the plaintiff was challenging just the opposite, namely an agency finding that the successful offeror's proposal did conform to the solicitation.

**B.    Lottery Period (Section 5.2.2.2.3)**

Section 5.2.2.2.3 of the solicitation (entitled "Lottery Period") provides that "[p]rior to the Exclusive Listing Period, single-unit properties located in Revitalization Areas and uninsurable properties located in approved purchase areas of an approved nonprofit or government entity shall be listed for sale on the HUD Bid Site for a period of seven (7) calendar days (the Lottery Period)." AR Tab 2H at 531. The purpose of the lottery period is to allow qualifying individuals, nonprofit organizations, and government entities an opportunity to acquire these particular properties at a discount, before they are listed for a competitive sale. See id. at 530.

Prescient's Work Flow Chart states that "[p]rior to Exclusive Listing Period, properties located in Revite areas and uninsured properties that are located in approved purchase areas are listed for 5 days and if bids are received on the 6th day awarded by a lottery system." AR Tab 6C at 3089. The TEP concluded that the Lottery Period proposed in the chart (5 days) conflicted with the Lottery Period specified in section 5.2.2.2.3 of the solicitation (7 days). See AR Tab 9A at 4407.

Prescient contends that the TEP's conclusion was arbitrary and capricious because it did not take into consideration the discussion of the lottery period contained in Prescient's draft marketing plan. There, Prescient states that "[i]f a property is located in a Revite area and/or is [uninsured], it is open to the 'Lottery' during Step 3 for seven (7) calendar days to permit [governmental] and eligible organizations in HUD discount programs to submit bids prior to the Exclusive Listing Period." AR Tab 6C at 3101. Prescient argues that "[i]f anything, the five days in Prescient's Workflow Chart was a mere clerical error that was corrected elsewhere." Pl.'s Mem. at 34. It further contends that "[a]ll material necessary to demonstrate compliance . . . was contained on the face of Prescient's proposal," and that, therefore, "its proposal should not have been determined to be technically unacceptable on this basis." Id. (citing DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 666 n.16 (2010)).

These contentions are unpersuasive. First, the language in the Work Flow Chart setting a five-day, rather than a seven-day lottery period, does not appear to reflect a "clerical error." The Work Flow Chart does not simply contain the number five rather than the number seven; it also explains what will occur if bids are received on the sixth day. See AR Tab 6C at 3089. This implies, if not establishes, an intentional designation of a five, rather than seven-day lottery period in the Work Flow Chart, as opposed to a mere clerical error.

Further, in order to be found technically acceptable, a proposal must "clearly meet[] the requirements of the solicitation." AR Tab 2H at 655. Prescient's proposal, however, was ambiguous at best, because it contained inconsistent lottery periods, one which conformed to the solicitation and another which did not. In addition, the lottery period that conformed to the solicitation was not listed in the Work Flow Chart, as required; instead, it was contained in the marketing plan, which was provided to address an entirely separate sub-factor. The TEP was under no obligation to canvas Prescient's technical volume in search of a conforming lottery period. ST Net, Inc. v. United States, 112 Fed. Cl. 99, 110 (2013) ("[A]n agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place."); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 786–87

(2011) ("[I]t is the responsibility of the offeror to prepare its proposal according to the [solicitation's] specifications, and not the obligation of the agency to piece together a nonconforming proposal."); see also AR Tab 2H at 646 (provision in solicitation specifying that "[a]ny information not in its appropriate Section and not cross-referenced to a specific location will be assumed to have been omitted"). Therefore, it was not arbitrary, capricious, or contrary to law for the TEP to conclude that Prescient's proposal did not meet the requirements of section 5.2.2.2.3 of the solicitation.

## C.  Exclusive Listing Period (Section 5.2.2.3.1)

### 1.  TEP Finding of Deficiency

Section 5.2.2.3.1 of the solicitation provides that if a property has not been sold pursuant to the lottery or one of the other direct sales methods set forth in section 5.2.2, it "shall be listed on P260's bid site for an exclusive listing period, during which only bids received from individual purchasers who intend to occupy a property as their primary residence, qualified nonprofit organizations and government entities may be submitted." See AR Tab 2H at 533. The solicitation further provides that the time period for the exclusive listing "varies based on the insurability of a property." Id. It specifies a fifteen-day exclusive listing period for owner-occupant buyers for insured and insured with escrow properties. Id. It further instructs with respect to the timing for bid opening and acceptance that "[t]he contractor shall open and review bids received for insured/insured with escrow properties on the next business day following the tenth (10th) day of the Exclusive Listing Period." Then, "[i]f no winning bid is accepted by the tenth (10th) day . . . the Contractor shall open and review daily bids up to the fifteenth (15th) day." Finally, "[i]f no winning bid is accepted in the fifteen (15) day Exclusive Listing Period, the Contractor shall extend the listing to all buyers by listing the property in the Extended Listing Period." Id. at 533–34.

The section of Prescient's Work Flow Chart entitled "Competitive Exclusive Listing Period" stated as follows: "Insured 15 day period, Insured w/Escrow 10 day period." See AR Tab 6C at 3089. It further stated that, "[r]eview of bids occur on the next day after the period ends and then daily afterward if no acceptable bids were received." Id. The TEP concluded that Prescient's proposed listing period was technically unacceptable because it had "reduce[d] the Exclusive period from 15 days to 10 days for [insured with escrow] properties." AR Tab 9A at 4407.

Prescient argues that, contrary to the TEP's conclusion, its proposal conforms to the solicitation. It points again to its marketing plan, which contains language that it claims clarifies the timelines set forth in its Work Flow Chart. Specifically, the Draft Marketing Plan, like the Work Flow Chart, states that that the "[t]imeline [for the exclusive listing period] is 15 days for Insured (IN) and 10 days [for] Insured with Escrow (IE) listings" and that "[i]f no bids are acceptable, daily bid opening commences until an acceptable bidder can be awarded." AR Tab 6C at 3102. But the marketing plan contains a further statement not included in the Work Flow Chart that "[i]f no bids are received or none are acceptable, after the 16th day, property moves to the Extended Listing Period, and is open to all bidders, including investors." Id. Prescient argues that this last sentence establishes that its proposal conformed to the 15-day exclusive listing period because "[f]or both insured and insured with escrow properties, bids would be opened

after the 10th day, and if no acceptable bid had been received, there would be daily bid openings through the 15th day." Pl.'s Mem. at 8.

The Court concludes that it was not arbitrary and capricious for the TEP to conclude that Prescient's proposal did not conform to section 5.2.2.3.1. As noted, in order to be found technically acceptable, the proposal must "clearly" meet the requirements of the solicitation. The Work Flow Chart was facially inconsistent with the requirements of the solicitation because it proposed two different listing periods for the two categories of insured properties (fifteen days for insured and ten days for insured with escrow), while section 5.2.2.3.1 sets forth a single listing period for both (15 days). As was the case with the non-conforming lottery periods, the agency was not required to examine other parts of Prescient's proposal in order to attempt to resolve the discrepancy in the exclusive listing periods reflected in the Work Flow Chart. And even had it reviewed the language in the draft marketing plan, that language was also inexact. It also contained a ten-day exclusive listing period for insured with escrow properties, even as it stated (incongruously) that "[f]or both insured and insured with escrow properties, bids would be opened after the 10th day, and if no acceptable bid had been received, there would be daily bid openings through the 15th day." See AR Tab 6C at 3102.

In short, Prescient's proposal did not clearly meet the requirements of section 5.2.2.3.1. The TEP's conclusion that Prescient's proposal "reduced the Exclusive period from 15 days to 10 for [insured with escrow] properties" was neither arbitrary, capricious, nor contrary to law. See AR Tab 9A at 4407.

**2. Disparate Treatment**

As it argued with respect to section 5.2.1.2.3, Prescient alleges that the TEP found the proposals of Offerors 27 and 37 consistent with section 5.2.2.3.1, despite the fact that they proposed "the same approach as Prescient." Pl.'s Mem. at 22. This argument has no merit.

Thus, Offeror 27's Work Flow Chart in fact sets forth a fifteen-day period for both insured and insured with escrow properties. It reads as follows: "Is it insured or insured w/escrow? (Yes); Winning bids received by 10th day (No); Review each day of bids until 15th day." AR Tab 5E at 1845. Similarly, its work flow narrative includes this passage:

> For [insured] and [insured with escrow] assets the Firm will review bids on the first business day following the 10th day of the Exclusive Listing Period. . . . From this point on, bids will be reviewed each day until the winning bid is received. If no winning bids are received by the 15th day of the Exclusive listing period, the Firm will extend the offer to all buyers by listing the property in the Extended Listing Period.

Id. at 1849.

Offeror 37's proposal also does not distinguish between insured and insured with escrow properties; it establishes a 15-day exclusive listing period for both. AR Tab 5G at 2186. The Work Flow Chart states: "Insurable Marketing: 7 day lottery period (as applies) / 1-10 day owner/owner occupant sealed bid / 11-15 day owner-occupant daily bid." Id.

In short, unlike Prescient, neither Offeror 27 nor Offeror 37 submitted ambiguous proposals that appeared to subject insured properties and insured with escrow properties to different exclusive listing periods. Prescient, accordingly, has not shown that its proposal was evaluated disparately with respect to the requirements of section 5.2.1.2.3.

**D.  Initial List Price (Section 5.2.1.7)**

As noted above, the first of the five objectives for asset managers set forth in the solicitation was the accurate and competitive valuation of HUD properties. To that end, section 5.2.1.7 of the solicitation, titled "Initial List Price," states that "[t]he Contractor shall establish and record in P260 an initial list price based on any combination of valuation tools (i.e. appraisal, BPO, AVM, etc.)[4] as authorized by the GTR and record in P260 an initial list price based on the valuation tools used as required by paragraph 24 CFR 291.100(b) for all properties. . . ." AR Tab 2H at 524.

Prescient's Work Flow Chart proposed to establish the initial list price by ordering an appraisal, which would be subjected to a preliminary review for quality control purposes. If the appraisal did not pass the review, the Work Flow Chart indicated that a BPO "may be ordered to verify sales price for [quality control] purposes, if warranted." AR Tab 6C at 3087.[5] Thus, under Prescient's proposal, list price would be established based solely on an appraisal, if the appraisal was found acceptable after Prescient's quality control review. Prescient's proposal did not provide, as a matter of course, for the use of more than one valuation tool to set price.

The TEP found Prescient's proposal unacceptable because it did not propose "using a combination of valuation tools (i.e. appraisal, BPO, AVM etc.) as required in Section 5.2.1.7" of the solicitation. AR Tab 9A at 4408. For that reason, the TEP concluded that Prescient had "failed to satisfactorily address properties being accurately and competitively valued." Id. at 4407.

Prescient does not deny that its proposal does not require that a combination of tools always be used when establishing list price. Instead, it argues that section 5.2.1.7 of the solicitation gives asset managers the option of either using a combination of valuation tools to set

---

[4] "BPO" refers to Broker Price Opinion and "AVM" refers to Automated Valuation Method. AR Tab 2H at 495.

[5] Specifically, Prescient's Work Flow Chart stated as follows:

> Appraisal received and a preliminary review is made by appraisal staff for [quality control] purposes. The review entails verification that comps were in proximity and reasonable and adjustments were consistent with industry standards to verify the value is reasonable. In addition the disposition appears reasonable based on the facts stated within the appraisal. . . . If appraisal does not pass [quality control] area . . . . A BPO may be ordered to verify sales price for QC purposes, if warranted.

AR Tab 6C at 3087.

list price if authorized by the GTR or, instead, using only an appraisal as required by 24 C.F.R. § 291.100(b) for all properties. Pl.'s Mem. at 10.

There is no question that Section 5.2.1.7 is very poorly written. If taken literally, it appears to require that a contractor record two list prices: one that is established "based on any combination of valuation tools (i.e. appraisal, BPO, AVM, etc.) as authorized by the GTR" and one that is "based on the valuation tools used as required by paragraph 24 CFR 291.100(b) for all properties . . . ." The latter regulation establishes as a general policy for the sale of HUD acquired properties that "[t]he list price, or asking price assigned to the property is based upon an appraisal conducted by an independent real estate appraiser using nationally recognized industry standards for the appraisal of residential property." 24 C.F.R. § 291.100(b).

Of course, it makes little sense to require the contractor to establish two different list prices, one based on a combination of tools and one based solely on an appraisal. And it makes no sense at all to require that the contractor record two different list prices. Further, section 5.2.1.7 includes the phrase "tools used as required by paragraph 24 CFR 291.100(b) for all properties" (emphasis supplied), but 24 C.F.R. § 291.100(b) refers to a single tool—an appraisal—as the basis for setting list price.

At oral argument in this case, the government argued that section 5.2.1.7 requires offerors to use a combination of tools (i.e., more than one tool) to establish list price. It contended that the citation to 24 C.F.R. § 291.100(b) in the second clause of the section was part of a "confusing effort" to confirm HUD's intent that the reference to "any combination of valuation tools" be interpreted to require that one of the multiple tools used must be an appraisal. Oral Arg. at 23:00–25:00.

The Court finds the government's interpretation of the provision tortured, at best. There was no need for the solicitation to make clear in the second clause of section 5.2.1.7 that an appraisal was always required to be used as a valuation tool because (as discussed above) section 5.2.1.2 already required that an appraisal be obtained whenever a property was to be sold. See AR Tab 2H at 522. If the government intended to reinforce that requirement in section 5.2.1.7 and to avoid the implication that an appraisal need not be one of the tools used as part of "any combination of valuation tools" then the method it chose to do so—requiring contractors to also record a price based on "valuation tools used as required by paragraph 24 CFR 291.100(b)"— was a peculiar way to accomplish it. HUD could have simply reworded the first clause of that section to read: "[t]he Contractor shall establish and record in P260 an initial list price based on an appraisal combined with any other valuation tool(s) as approved by the GTR."

Prescient, on the other hand, interprets section 5.2.1.7 to give the contractor two options for setting the list price. On the one hand, it may use "any combination of valuation tools," so long as such combination was authorized by the GTR. On the other, it may rely exclusively on an appraisal because appraisals are "valuation tools used as required by paragraph 24 CFR 291.100(b)." Pl.'s Mem. at 27.

Prescient's interpretation, of course, requires the Court to treat the word "and" as used in section 5.2.1.7 as disjunctive, rather than conjunctive. "The usual meaning of the word 'and' . . . is conjunctive, and 'unless the context dictates otherwise, the 'and' is presumed to be used in its

ordinary sense . . . ." <u>Reese Bros. v. United States</u>, 447 F.3d 229, 235–36 (3d Cir. 2006) (quoting <u>Am. Bankers Ins. Grp. v. United States</u>, 408 F.3d 1328, 1332 (11th Cir. 2005)); <u>OfficeMax v. United States</u>, 428 F.3d 583, 589 (6th Cir. 2005) (citing in part <u>Crooks v. Harrelson</u>, 282 U.S. 55, 58 (1930)); Webster's Third New International Dictionary 80 (2d ed. 2002); 1A Norman J. Singer, Statutes and Statutory Construction § 21.14 at 179–80 (6th ed. 2002)). Where, however, treating the word "and" as conjunctive could lead to an "anomalous or absurd result," it may be appropriate to treat it as disjunctive. <u>See</u> <u>Reese Bros.</u>, 447 F.3d at 235–36; <u>see also</u> <u>Peacock v. Lubbock Compress Co.</u>, 252 F.2d 892, 893 (5th Cir. 1958) (observing that "'[i]n the construction of statutes, it is the duty of the Court to ascertain the clear intention of the legislature" and that "[i]n order to do this, Courts are often compelled to construe 'or' as meaning 'and,' and again 'and' as meaning 'or'" (quoting <u>United States v. Fisk</u> 70 U.S. 445, 448 (1866))).

For the reasons set forth above, the Court concludes that reading the word "and" in the conjunctive sense does lead to absurd or anomalous results in the context of section 5.2.1.7. As noted, if "and" is used in the conjunctive sense then the solicitation would require that the contractor establish and record two different list prices for a single piece of property—one based on a combination of evaluation tools and one based on an appraisal alone. By contrast, if "and" is interpreted in the disjunctive, as Prescient argues, then a contractor would be able to base the list price on "any combination of valuation tools" if that were authorized by the GTR, or on an appraisal (as is required under the general policy set forth at 24 C.F.R. § 291.100(b) for all HUD properties). This reading of the section is most consistent with its language and is also consistent with HUD's general policy, which provides for reliance upon appraisals to set list price.

This reading of section 5.2.1.7 is also consistent with the rest of the solicitation. Pursuant to section 5.2.1.2, the contractor must "obtain an AS-IS appraisal performed by an FHA roster appraiser." AR Tab 2H at 522. The same section further provides that "the contractor shall work with HUD should alternate methods other than an appraisal be used to obtain the initial list price." This phrase, read in context, clearly suggests that the use of alternate methods other than an appraisal is optional, but that if such other methods are used, the contractor is required to work with HUD on the development of the list price.

Further, section 5.2.1.2.3, which is entitled "New Appraisals and Report," states that "[n]ew appraisals other than the appraisal that is used as one or more multiple valuation tools to help establish list price, if applicable, can only be ordered with GTR approval." <u>Id.</u> Although also not a model of grammatical clarity, this section is most naturally read to indicate that the appraisal can serve as the "one" valuation tool used to establish list price, or can be one of the "multiple valuation tools" used for that purpose.

In short, the Court concludes that Prescient's interpretation of section 5.2.1.7 is the only reasonable one given its language and the context in which it appears. Accordingly, HUD was incorrect when it concluded that Prescient's proposal was deficient based on its inconsistency with section 5.2.1.7 because it "failed to satisfactorily address properties being accurately and competitively valued," and that conclusion may not serve as the basis for finding Prescient's proposal technically unacceptable.

E. **Materiality of Deficiencies**

It is well-established that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 (Fed. Cir. 2009) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)). Further, "[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." Centech, 554 F.3d at 1037.

As described above, the Court has upheld the TEP's findings as to three of the four inconsistencies it identified between Prescient's proposal and the terms of the solicitation. Prescient contends, however, that there is nothing in the record that reflects HUD's consideration of whether Prescient's failures to meet the requirements of the solicitation were "material" ones. Pl.'s Mem. at 32. It further argues that even assuming that its proposal was inconsistent with the solicitation in one or more of the respects identified in the TEP report, the inconsistencies "whether taken individually or collectively, are not material and should not be the basis for a determination of technically unacceptable." Id.

Prescient's arguments lack merit. As noted, the TEP rated Prescient's technical proposal unacceptable. Under the solicitation, a finding of technical unacceptability means that the proposal contained deficiencies. A "deficiency" is defined, in pertinent part, as "a material failure of a proposal to meet a Government requirement." AR Tab 2H at 656. In its report, the TEP specified and discussed each of the four deficiencies that formed the bases for the unacceptable rating. AR Tab 9A at 4407–08. Thus, the TEP's conclusion that Prescient's proposal was unacceptable was necessarily also a conclusion that the inconsistencies it identified constituted material failures to meet the requirements of the solicitation. In that regard, the Court notes that a separate discussion of materiality is not required because the TEP's path of reasoning can be discerned from its report considered in the context of the solicitation's requirements. See State Farm, 463 U.S. at 43 (court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (quoting Bowman, 419 U.S. at 286).

Further, the TEP's conclusion that Prescient's proposal materially failed to meet the terms of the solicitation is supported by the record. "A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009) (citations omitted). By contrast, "[d]e minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected if they are." Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996); see also E.W. Bliss, 77 F.3d at 448–49 (observing that "[w]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand") (quoting M.W. Kellogg Co./ Siciliana Appalti Costruzioni v. United States, 10 Cl. Ct. 17, 26 (1986)).

In this case, each of the three inconsistencies that the Court has concluded the TEP reasonably identified constitutes a failure to comply with a material term of the solicitation.

Thus, the failure to seek GTR approval before conducting a second appraisal implicates one of the "five primary objectives" for asset managers—specifically, the objective that requires them to "ensure that properties are accurately and competitively valued." <u>See</u> AR Tab 2H at 494–95. The proposal's reduction in the length of the exclusive listing period for insured with escrow properties, within which owner occupants, among other select prospective purchasers can bid on the properties, implicated another of the five primary objectives—ensuring that "sales create owner occupant opportunities." <u>See</u> <u>id.</u> It also frustrated agency policy by reducing the window within which certain non-profit organizations and governmental entities might take advantage of the discounts available to them during the exclusive listing period. <u>See</u> <u>id.</u> at 530. The reduction in the lottery period similarly subverts HUD's goal of offering certain types of properties to eligible persons at a discount under its "Good Neighbor Next Door" program. <u>Id.</u> at 529.

Further, it was not the responsibility of the agency to sift through Prescient's proposal and piece together a compliant offer. Rather, "[i]t is well established that all offerors . . . are expected to demonstrate their capabilities in their proposals." <u>Software Eng'g Servs., Corp. v. United States</u>, 85 Fed. Cl. 547, 555 (2009) (quoting <u>Int'l Res. Recovery, Inc. v. United States</u>, 60 Fed. Cl. 1, 6 (2004)). "Undoubtedly, an offeror carries the burden of presenting 'an adequately written proposal, and an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably.'" <u>Westech Intern., Inc. v. United States</u>, 79 Fed. Cl. 272, 296 (2007) (quoting <u>United Enter. & Assocs. v. United States</u>, 70 Fed. Cl. 1, 26 (2006)). Indeed, under the solicitation at issue in this case, a proposal had to "clearly meet[] the requirements of the solicitation" in order to be rated technically acceptable. AR Tab 2H at 655.

In short, each of the terms of the solicitation with which Prescient failed to comply is directly related to the accomplishment of important agency objectives under the procurement. None of them involved "de minimis errors" that "can safely be ignored." Further, the TEP's conclusion that Prescient failed to clearly meet the requirements of the solicitation is amply supported by the record. Therefore, the Court finds that the TEP's conclusion that Prescient's proposal was technically unacceptable was neither arbitrary, capricious, nor contrary to law.[6]

---

[6] In addition to challenging the unacceptable rating the TEP assigned, Prescient also takes issue with the statement in the contracting officer's competitive range memorandum that "any offerors receiving an unacceptable rating were reviewed prior to establishing the Competitive Range in order to determine the specific nature of any identified deficiencies and whether or not the identified deficiencies could be corrected." It also challenges her statement that proposals found technically unacceptable "had major revisions that could not be corrected through discussions and are not capable of being made technically acceptable." Pl.'s Mem. at 24–25. To the extent that Prescient is arguing that the record lacks adequate documentation that a review was conducted "to determine the specific nature of any identified deficiencies and whether or not the identified deficiencies could be corrected," the Court finds that argument without merit. <u>See</u> <u>id.</u> at 13. First, in the Court's view, the contracting officer's reference to a "review" refers to the review that the TEP conducted, which culminated in the assignment of an unacceptable technical rating to Prescient. Second, and in any event, whether or not the identified deficiencies could theoretically be corrected (if the agency chose to give Prescient and other offerors the opportunity to do so) is irrelevant because the solicitation mandated that any proposal found

**CONCLUSION**

For the reasons discussed above, Prescient's motion for judgment on the administrative record is **DENIED** and the government's cross-motion is **GRANTED**. Accordingly, Prescient's complaint is hereby **DISMISSED**. The Clerk is directed to enter judgment accordingly. The parties shall bear their own costs.


**IT IS SO ORDERED.**



s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

---

technically unacceptable would not be given further consideration, and it did not provide offerors with any right to correct deficiencies in their technical proposals. See ST Net, Inc., 112 Fed. Cl. at 111 (in a negotiated procurement where discussions not required, agency not required to give offeror an opportunity to correct and revise a technically defective proposal).